**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Toriano JOHNSON, Daryl Davis, and Hasam Williams, Defendants–Appellants.**

**No. 13–14676.**

United States Court of Appeals, Eleventh Circuit.

March 15, 2016.

Kathleen Mary Salyer, Wifredo A. Ferrer, Michael E. Gilfarb, U.S. Attorney's Office, Miami, FL, Mark Dispoto, Michael Garrett Walleisa, U.S. Attorney's Office, Fort Lauderdale, FL, for Plaintiff–Appellee.

Gennaro Cariglio, Jr., Gennaro Cariglio Jr., PL, Marc David Seitles, Law Offices of Marc David Seitles, PA, Miami, FL, Martin Roth, Martin L. Roth, PA, Fort Lauderdale, FL, for Defendants–Appellants.

Before WILLIAM PRYOR, DUBINA, Circuit Judges and ROBRENO,* District Judge.

PER CURIAM:

Defendants, Toriano Johnson, Daryl Davis, and Hasam Williams, appeal their judgments of conviction for Hobbs Act robbery charges, conspiracy charges, and gun possession charges. Davis and Williams also appeal their sentences. After reviewing the record and having the benefit of oral argument, we affirm all the judgments of conviction and the sentences for Davis and Williams.

* Honorable Eduardo C. Robreno, District Judge for the Eastern District of Pennsylvania, sitting by designation.

## I. BACKGROUND

### A. *Facts*

The government's chief witness at trial was co-conspirator Nathaniel Moss, who pleaded guilty and agreed to cooperate with the authorities in exchange for a mandatory life sentence plus twenty years and a waiver of the death penalty. The government's other chief witness was FBI Agent David Magnuson, who testified as an expert in the operation of cell phones through cell towers and cell sectors. Agent Magnuson analyzed the cell phone records and prepared maps showing the approximate locations of the defendants' cell phones at relevant times during the conspiracy.

Moss testified that in February 2005, he, along with Williams, Davis, Bobby Madison, Terrance Brown, and another individual, committed an armed robbery of a Brink's messenger at a Wachovia Bank in West Palm Beach, Florida, stealing approximately $575,000. Moss stated that Johnson recruited him and gave him a firearm to use in the robbery and that Johnson and Brown planned the robbery. Moss testified that he and Williams held the messenger at gunpoint, disarmed him, and fled with the money bag.

Moss also testified that in July 2010, the crew planned to rob a Brink's currency delivery at the Bank of America in Lighthouse Point, Florida. While Madison was attempting to steal a Honda to use as a getaway car for the robbery, police arrested him. Johnson and Brown arranged for Madison's bond. Brown and Moss stole two more cars, one silver Toyota Camry and one burgundy Infiniti SUV, to use as getaway cars. Moss stated that the crew met at Davis's home to plan the robbery,

and they met there on the morning of the attempted robbery. To prepare for the robbery, Williams dressed as a woman, and Moss dressed as a construction worker, wearing a wig, an orange safety vest, and a bulletproof vest he had purchased with money provided by Johnson. Brown communicated with the group by conference calls on disposable drop phones. The Brink's truck never arrived at the bank, so the group abandoned their robbery plans.

David Dyess, a detective with the Lighthouse Police Department, testified that later in the day of the attempted robbery at the Bank of America, a Lighthouse Point tag reader detected the stolen Camry, in which Madison and Williams were riding, in the vicinity of the bank. He stated that the tag reader records the vehicles that enter and exit the city and compares the license plates against a national stolen vehicle registry. This tag reader was directly across the street from the bank. Once they were alerted to the stolen Camry, Dyess testified that the police pursued it but they lost it in traffic. The police later found the Camry abandoned in the driveway of a house. After Williams emerged from the Camry with a loaded gun, police arrested him. The police later found a wig and dress behind the row of houses where they apprehended Williams. While in police custody, Williams waived his *Miranda*[1] rights and gave a videotaped statement, which the government played for the jury. As depicted in the videotape, Williams gave evasive and inconsistent answers to the officer's questions about his presence in the area of the Bank.

While investigating this attempted robbery, Agent Magnuson testified that Moss's cell phone records placed his phone in the areas where the Camry and Infiniti were stolen and showed calls between Moss's cell phone and cell phones attributed to Williams, Madison, and Brown at the approximate times the cars were stolen. He also stated that Moss's and Johnson's cell phone records placed them in the vicinity of the bank at approximately the same time that the Brink's truck driver made a delivery that day.

Moss also testified about a September 2010 robbery. On the morning of September 17, the same group of individuals, with the addition of "Soldier," who was later identified as co-defendant Joseph K. Simmons, met at Davis's house to prepare for a Brink's messenger robbery. As before, Moss dressed as a construction worker. Madison drove the stolen Infiniti SUV. Shortly before the Brink's truck arrived at the Bank of America in Miramar, Florida, the police responded to a vehicle accident across the street from the bank. Madison panicked when he saw the police, drove away, and abandoned the Infiniti in front of a nearby pizza establishment. He ran to a Miami–Dade Transit Authority van that Davis had parked earlier for escape purposes and left the area in that van. A woman who lived near the bank testified that she saw three men, one wearing an orange safety vest, run through her backyard at approximately the same time as the defendants fled from the bank. Agent Magnuson testified that Williams's and Johnson's cell phone records placed them in the area of the bank at the pertinent time and that there were approximately 54 calls between Davis's cell phone and Brown's cell phone that day. After this failed robbery attempt, the group met at Davis's house and agreed to exclude Madison from any further robbery plans.

Moss testified that in preparation for another robbery on October 1 at the same Bank of America, he and Brown stole two more cars, a white Toyota Camry and

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

silver Honda Civic, to use as getaway cars. According to Moss, Brown and Johnson organized and planned the robbery. Moss averred that Johnson gave him a firearm to use for the robbery, conducted surveillance of the bank area, and purchased five new drop phones for the crew to use. As usual, the group met at Davis's house the morning of the robbery, and Moss dressed as a construction worker, adding a baseball cap to his black wig, orange safety vest, and bulletproof vest. Soldier wore a green University of Miami hooded sweatshirt.

The Brink's truck arrived minutes before the noon hour, and Moss stated that everyone was in position. A nearby IHOP (International House of Pancakes) restaurant security camera captured images of a black Chevy Traverse, driven by Johnson, a white Toyota Camry with Moss, Soldier and one other man in it, and the Brink's truck pulling into the bank's parking lot shortly before 12:00 p.m. Agent Magnuson testified that cell phone records placed Moss's and Brown's cell phones in the area where the cars were stolen at the approximate time that the cars were stolen. He also stated that Williams's cell phone records showed that between 11:32 a.m. and 11:45 a.m., his cell phone was moving from Davis's residence toward the Bank of America and was in the vicinity of the bank between 11:49 a.m. and 12:26 p.m. Agent Magnuson further testified that Brown's cell phone records indicated that Brown was in the vicinity of the bank at the pertinent times and that numerous calls were made from Brown's cell phone to Davis's and Williams's cell phone numbers between 11:57 a.m. and 12:17 p.m. Likewise, he testified that Johnson's and Davis's cell phone records indicated that they were in the vicinity of the bank at the relevant times.

On October 1, after the Brink's messenger, Alejandro Arencibia, exited the truck with the money bag, Moss and Soldier approached him. Moss held Arencibia at gunpoint while Soldier grabbed the money bag and ran toward a white Toyota Camry that departed immediately after Soldier entered the vehicle. The Brink's driver fired a round at Moss, who returned fire. Unable to disarm Arencibia, Moss killed him with a single gunshot to his head. Moss fled to the getaway car, but it was gone. He ran to the other getaway car, but it too was gone. After hiding in the bushes of an abandoned house, Moss was ultimately apprehended by the police. When the police questioned him upon his arrest, Moss denied any knowledge of a robbery. A woman who lived near the bank testified that she heard two shots from the direction of the bank at approximately 12:00 p.m. and saw two men, one wearing a t-shirt and shorts and one wearing a hooded sweatshirt, jump the fence and run across her backyard. Another witness testified that he saw two black males, one in a hooded UM sweatshirt and one in a black shirt, run past at the relevant time.

Police Officer Gerard Starkey investigated the October 1 bank robbery and murder. After reviewing surveillance video and Moss's cell phone records, Officer Starkey considered several of the defendants as suspects. Officer Starkey interviewed Moss for the first time on June 8, 2011, and at that time, Moss had not entered a plea and was facing a possible death sentence for the murder of Arencibia. During this interview, Moss discussed his involvement in the October robbery but did not disclose any names of his cohorts. At the end of the interview, Officer Starkey showed Moss photographs of Davis, Johnson, and Brown, but Moss did not indicate he knew them. Several months later, Officer Starkey interviewed Moss again and, this time, Moss disclosed the names of his cohorts and the role each

played in the robbery. Moss also told Officer Starkey about the prior robbery in 2006 and the robbery attempts in July and September 2010. Soon thereafter, Moss entered a guilty plea and agreed to cooperate with the government in exchange for a mandatory life sentence plus twenty years and a waiver of the death penalty. The police arrested Johnson, Davis, Williams, and Brown that same day, and later apprehended Simmons.

### B. *Procedural History*

A Florida grand jury returned a second superseding indictment charging that, between May 2010 and October 1, 2010, Johnson, Davis, Williams and co-defendants Brown, Madison, and Simmons, conspired to commit Hobbs Act robbery of employees of Brink's Incorporated, in violation of 18 U.S.C. § 1951(a) (Count 1). The indictment further charged that defendants attempted to commit Hobbs Act robbery of Brink's security guards, in violation of 18 U.S.C. §§ 1951(a) and 2, and used and carried a firearm during and in relation to that crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2, on July 26, 2010, at a Bank of America in Lighthouse Point, Florida (Counts 2 and 3), and on September 17, 2010, at a Bank of America in Miramar, Florida (Counts 4 and 5). The indictment further charged that on October 1, 2010, defendants committed Hobbs Act robbery of Brink's security guards at a Bank of America in Miramar, Florida (Count 6), used and carried a firearm during and in relation to that crime (Count 7), and carried and used a firearm in furtherance of that crime of violence, resulting in the death of a Brink's security guard, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), and 2 (Count 8).

Count 9 charged that on July 26, 2010, Williams was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Johnson, Davis, Williams, Brown, and Simmons were tried jointly. The jury acquitted Simmons on all counts and found Brown guilty on Count 1, but failed to reach verdicts on the remaining counts. The government retried Brown, and the jury convicted him on Counts 2, 3, 4, 6, and 8, and acquitted him on Count 5. The district court sentenced Brown to 34 years' imprisonment. The jury found Johnson guilty on Count 1 and failed to reach a verdict on the remaining counts. Pursuant to a written plea agreement, Johnson entered an *Alford*[2] plea on Count 2. The district court sentenced Johnson to 20 years' imprisonment as to Count 1 and 10 years' imprisonment as to Count 2, to run consecutively, for a total sentence of 30 years' imprisonment. The jury found Davis guilty as to Count 1 and failed to reach a verdict as to the remaining counts. The district court sentenced Davis to 20 years' imprisonment. The jury found Williams guilty on Counts 1, 2, 3, and 9, acquitted him of Counts 4 and 5, and failed to reach a verdict on the remaining charges. The district court sentenced Williams to 18 years on Counts 1 and 2, to be served concurrently; five years as to Count 3, to be served consecutively; and five years as to Count 9, to be served concurrently.

## II. ISSUES

1. Whether sufficient evidence supports Johnson's conviction for conspiracy to commit Hobbs Act robbery.

---

**2.** *North Carolina v. Alford,* 400 U.S. 25, 37–38, 91 S.Ct. 160, 167–68, 27 L.Ed.2d 162 (1970) (holding that the trial court did not err by allowing defendant to knowingly and vol- untarily enter a plea to a lesser offense to avoid a possible death sentence even though the evidence of guilt as to the murder charge was strong).

2. Whether the district court abused its discretion by denying Williams's motion to sever his trial.

3. Whether the district court impermissibly limited defendants' cross-examination of a cooperating co-conspirator.

4. Whether the district court abused its discretion in ruling on various evidentiary challenges.

5. Whether the district court erred in admitting cell phone and cell tower records at trial.

6. Whether the district court's instruction to the jury during its deliberation was unduly coercive and whether the district court erred by giving the jury, per its request, a new verdict form as to Williams.

7. Whether the district court abused its discretion by denying Davis's motion for new trial based on newly discovered evidence.

8. Whether Davis's sentence is reasonable.

9. Whether Williams's sentence violates the Sixth Amendment.

## III. STANDARDS OF REVIEW

This court reviews "the sufficiency of evidence to support a conviction *de novo,* viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor,* 480 F.3d 1025, 1026 (11th Cir.2007).

We review for abuse of discretion a district court's ruling on a severance motion, its ruling on a motion for new trial, its limitation on the scope of cross-examination, and its evidentiary rulings. *See United States v. Kennard,* 472 F.3d 851, 859 (11th Cir.2006) (severance motion); *United States v. Sweat,* 555 F.3d 1364, 1367 (11th Cir.2009) (new trial motion);

*United States v. Maxwell,* 579 F.3d 1282, 1295 (11th Cir.2009) (limitation of cross-examination); *United States v. Edouard,* 485 F.3d 1324, 1343 (11th Cir.2007) (evidentiary rulings).

However, where a defendant fails to preserve a challenge to an evidentiary ruling, this court's review is for plain error. *Id.* Under the plain error review, there must be (1) an error, (2) that is plain, and (3) that affects the defendant's substantial rights. *United States v. Shelton,* 400 F.3d 1325, 1328–29 (11th Cir.2005) (internal quotation marks omitted). If the first three conditions are met, this court may correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1329 (internal quotation marks omitted).

When reviewing sentencing guideline issues, this court reviews "purely legal questions *de novo,* a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference." *United States v. Rothenberg,* 610 F.3d 621, 624 (11th Cir.2010) (internal quotation marks omitted). "For a finding to be clearly erroneous, this Court must be left with a definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). This court reviews the final sentence imposed by the district court for reasonableness and reviews the reasonableness of the sentence for an abuse of discretion. *United States v. Irey,* 612 F.3d 1160, 1188–90 (11th Cir. 2010) (en banc).

## IV. DISCUSSION

### A. *Guilt Stage Issues*

1. *Sufficiency of the evidence to support Johnson's conspiracy conviction*

■ Johnson claims that the government did not present sufficient evidence

for the jury to find beyond a reasonable doubt that he conspired to commit Hobbs Act robbery because the testimony of co-defendant Moss was not credible and unreliable. However, his attack on Moss's credibility is futile because "the jury has exclusive province over [the credibility] determination and the court of appeals may not revisit this question." *United States v. Chastain,* 198 F.3d 1338, 1351 (11th Cir. 1999). Moss's testimony was corroborated by other evidence, such as cell phone and cell tower records that placed Johnson's cell phone in the vicinity of the banks at the time of the Brink's deliveries and security camera footage that matched Moss's description of Johnson's vehicle at each of the robberies. In addition, Moss was subjected to extensive cross-examination by each of the defendants' attorneys, and the district court cautioned the jury about its consideration of testimony by a witness who has pleaded guilty and hopes to gain favorable sentencing treatment from his cooperation with the authorities. Accordingly, Johnson is not entitled to relief on this claim.

### 2. *Williams's motion to sever his trial*

■ Williams argues that because the district court erred in denying his motion for severance, the jury heard prejudicial evidence regarding unrelated nefarious activities of his co-defendants. He contends that his case requires severance because (1) it involved "inculpatory evidence [that was] admitted against one Defendant that [wa]s not admissible against the other," and (2) it contained "a cumulative and prejudicial 'spill over' effect [that] prevent[ed] the jury from sifting through the evidence to make an individualized determination as to each Defendant." *United States v. Chavez,* 584 F.3d 1354, 1360–61 (11th Cir.2009) (citations omitted).

Williams cannot demonstrate that the district court abused its discretion. Usually, defendants who are indicted together are tried together except where a defendant shows that a joint trial would actually prejudice him and that "a severance is the only proper remedy for that prejudice." *United States v. Lopez,* 649 F.3d 1222, 1234 (11th Cir.2011). Because a district court's limiting instructions usually cure any prejudice resulting from a joint trial, severance will be granted "only if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 1234–35 (internal quotation marks omitted). Here, the district court issued a curative instruction at the beginning and the end of the government's presentation of evidence against co-defendant Brown—that he participated in robberies in 2001 and 2003—for the jury to consider the evidence only as to defendant Brown, and the district court instructed the jury that it must consider the evidence against each defendant separately and individually. Moreover, the parties' stipulation, which was read to the jury, stated that Williams was not a participant in the earlier robberies. In light of these instructions and the stipulation, Williams cannot show that the jury was prevented from making a reliable judgment about his guilt.

### 3. *Defendants' challenge to the cross-examination of Moss*

■ Defendants argue that the district court impermissibly limited their cross-examination of Moss and violated their Sixth Amendment confrontation rights. The crux of their argument centers on Moss's motive to lie. They assert that Moss's attorney allegedly provided him information about the government's investigation of the robberies prior to Moss's first de-

briefing in June 2011. They claim that Moss used this information to create a story implicating them in the robberies. They alleged that because Moss was the cornerstone of the government's case against them and they were not able to thoroughly cross-examine him, this court should reverse their convictions.

At the close of the government's case, the district court denied defendants' motions for mistrial and observed that "there was more than fair cross-examination" of Moss on his motive to lie. (R. Vol. 1010 p. 288.). A defendant "is entitled only to an *opportunity for effective cross-examination, not cross-examination that is effective in whatever way, or to whatever extent, the defendant might wish." Maxwell,* 579 F.3d at 1296 (quoting *United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1366 (11th Cir.1994)). The record demonstrates that defendants' counsel thoroughly cross-examined Moss and exposed sufficient facts for the jury to draw inferences regarding his motive to lie. Moreover, counsel impeached Moss with his testimony from his change of plea hearing and attacked his credibility in their closing arguments. Based on the entire context of the trial, including the defense theory, Moss's testimony, the cross-examination of Moss, and the district court's curative instructions, the district court did not err.

### 4. Evidentiary rulings

■ Defendants raise numerous evidentiary challenges, asserting that the district court abused its discretion: (1) by not granting Johnson's motion for mistrial because Moss's unsolicited remark about knowing Johnson since they were in prison was unduly prejudicial; (2) by denying Davis a fair trial because it allowed Moss to testify that he would not lie because of his Muslim religion; (3) by allowing the government to question Agent Starkey re-

garding statements made by Moss during his first debriefing and his explanation of how Johnson became a person of interest; and (4) by allowing the prosecutor to become a witness during his questioning of Lisa McCarty. A review of the record demonstrates that none of these challenges merit relief. Defendants cannot demonstrate that the district court abused its discretion or committed plain error in making these evidentiary rulings. *See, e.g., United States v. Emmanuel,* 565 F.3d 1324, 1334 (11th Cir.2009) ("Where the comment is brief, unelicited, and unresponsive, adding nothing to the government's case, the denial of a mistrial is proper."); *United States v. Silvestri,* 409 F.3d 1311, 1327–28 (11th Cir.2005) (stating that when a defendant invites an error, the court is precluded "from invoking the plain error rule and reversing"); *Shelton,* 400 F.3d at 1328–29 (where a defendant fails to preserve a challenge to an evidentiary ruling, this court's review is for plain error); *United States v. Prieto,* 232 F.3d 816, 820–22 (11th Cir.2000) (stating "that statements made after an arrest are not automatically and necessarily contaminated by a motive to fabricate" and can be admissible as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B)).

### 5. Johnson and Williams's challenge to the admission of cell phone records

■ For the first time on appeal, Johnson and Williams challenge the district court's admission of the cell phone records and cell tower records as a violation of their Fourth Amendment rights because the government obtained these records without a warrant based on probable cause. To succeed on their claim, Johnson and Williams must demonstrate that the district court plainly erred by allowing these records into evidence. *See United States v. Young,* 350 F.3d 1302, 1305 (11th

Cir.2003) (appellate review is for plain error when party fails to assert theory in the district court). Their argument is foreclosed by our recent decision in *United States v. Davis,* 785 F.3d 498 (11th Cir. 2015) (en banc), *cert. denied,* —— U.S. ——, 136 S.Ct. 479, 193 L.Ed.2d 349 (2015). We concluded in Davis that there was no search within the meaning of the Fourth Amendment and that "the government's obtaining a § 2703(d) court order for the production of [defendant's telephone company's] business records did not violate the Fourth Amendment." *Id.* at 511. Hence, this argument is meritless.

### 6. *Williams and Davis's challenge to the final jury instruction and verdict form*

■ Williams and Davis argue that the district court's final instruction to the jury during its deliberation was unduly coercive, and Williams further challenges the manner in which the district court provided the jury, upon its request, with a new verdict form. They contend that the final instruction was coercive in light of the district court's note instructing the jury to continue its deliberations when they had deliberated for two days, and the district court's issuance of an *Allen*[3] charge during the same period of deliberations. After a recess, the jury reconvened and sent a note informing the district court that they were unable to reach a unanimous decision as to four of the defendants. The district court responded with an instruction stating, in part:

I wish to advise you that you do not have to reach a unanimous agreement on all of the charges before returning a verdict on some of them. Therefore, if you have reached unanimous agreement on any of the charges against any of the defendants, we ask that you return your unanimous verdict with respect to each of those charges on which you have reached unanimous agreement.

(R. Vol.954, p. 3.)

Later, the jury requested a new verdict form for Williams, and the district court provided it, but did not inform Williams or his counsel until approximately 30 minutes afterward. The jury soon announced it had reached its verdicts, and when court convened, Williams's counsel objected to the new verdict form and moved for a mistrial. The district court denied the motion, stating that jurors make mistakes on forms and emphasizing that no verdict is final until the jury has signed it. (R. Vol.954, p. 11–12.) The district court filed the discarded verdict form under seal in light of Williams's objections. The jury verdicts were read in open court, and the district court polled the jury on its verdicts as to all defendants. (*Id.* at 14–19.) Both Davis and Williams filed motions for new trial which the district court denied.

"Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts." *United States v. Williams,* 526 F.3d 1312, 1320 (11th Cir.2008) (quoting *United States v. Prather,* 205 F.3d 1265, 1270 (11th Cir.2000)). Further, in assessing whether a charge was coercive, "we consider the language of the charge and the totality of the circumstances under which it was delivered." *United States v. Woodard,* 531 F.3d 1352, 1364 (11th Cir.2008).

---

**3.** *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (approving an instruction that admonishes each juror to reexamine his or her own view of the evidence in light of the arguments of the other jurors and instructing the jury to return to its deliberations in the hopes of reaching a verdict); *see also* 11th Cir. Pattern Jury Instructions (Criminal Cases), Trial Instruction 6 (adopting the text of the *Allen* charge).

The language of the instruction here did not suggest that the jury had to reach a verdict; rather, by the use of the past tense, it informed the jury to report decisions it had previously made. Additionally, viewing the totality of the circumstances, given the short amount of time it took for the jury to return its partial verdicts after the district court gave the instruction, it is apparent that the jury complied with the instructions and reported verdicts it had previously reached against each of the defendants. There was no error.

■ Moreover, for the first time on appeal, Williams asserts that the district court violated his Double Jeopardy rights by providing the jury with a new verdict form, and that the district court denied him counsel at a critical stage of the trial when it provided a new verdict form to the jury without consulting him or his counsel. Because this is the first time Williams has raised this issue, he must satisfy the plain error standard. He cannot do so. First, the same empaneled jury deliberated and returned a single verdict form finding him guilty of Counts 1, 2, 3, and 9, and not guilty as to Counts 4 and 5. Williams does not enlighten the court as to how this was a constitutional violation. His mere assertion does not show any error, much less plain error, by the district court in providing a new verdict form to the jury.

Second, Williams cannot demonstrate error by the district court when it provided the new verdict form to the jury without his counsel present because he cannot show that this was a critical stage in his trial proceedings. The Supreme Court has held that once a prosecution commences, an accused is entitled to be represented by counsel at all "critical stages" of the prosecution, including pretrial proceedings at which he "require[s] aid in coping with legal problems or assistance in meeting his adversary." *United States v. Ash*, 413 U.S. 300, 313–14, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973). The purpose of the critical-stage inquiry is not to determine the point at which a criminal prosecution begins and the protections of the Sixth Amendment first take effect, but to identify specific proceedings thereafter for which the accused is entitled to the assistance of counsel and which cannot, without a valid waiver, be conducted in counsel's absence. *Moore v. Illinois*, 434 U.S. 220, 224–25, 98 S.Ct. 458, 462–63, 54 L.Ed.2d 424 (1977); *United States v. Wade*, 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967). The critical-stage test thus asks whether a proceeding threatens "potential substantial prejudice" to the defendant's rights that counsel's assistance could help avoid. *Wade*, 388 U.S. at 227, 87 S.Ct. at 1932. We conclude that there was nothing in this ministerial act that required legal aid for Williams or threatened potential substantial prejudice to him.

### 7. *Davis's motion for new trial*

During trial, Davis sought an order compelling his cell phone carrier/provider, Sprint, to produce his cell phone records for the cell phone number beginning with area code 305 in order to assist him with an alibi. The government had already received cell phone records from one of his cell phones that began with area code 404. Sprint complied by producing Davis's billing records but claimed that it no longer had the historic cell tower data and cell phone location for the area code 305 phone. Co-defendant Brown moved the court for production of cell site data and cell phone location information from the National Security Agency ("NSA") based upon widespread media reports disseminated prior to and during trial that the NSA was routinely collecting and storing

this information, and Davis adopted this request. The government responded that the NSA did not collect such information. Brown withdrew his request, and the district court denied the motion as moot.

After trial concluded, Davis moved the district court to reconsider its denial of his motion for new trial based on newly discovered evidence that the NSA had conducted a test project in 2010 to collect data on cell phone locations.[4] After the government filed responses in camera and under seal, the district court denied the motion as moot, finding that the NSA did not possess the information Davis sought. Davis asserts that he is entitled to a new trial or alternatively a remand to the district court for discovery and an evidentiary hearing concerning the nature and extent of the cell site location data collected by the NSA during the relevant time period.

Davis cannot prevail because he cannot demonstrate that any of the NSA's alleged collected cell site location data included his 305 area code cell phone, and that if it did, the information would be material or would produce a different result. *See United States v. Sjeklocha,* 843 F.2d 485, 487 (11th Cir.1988) (setting forth elements party must satisfy to be entitled to a new trial based on newly discovered evidence). Davis bases his argument on pure speculation that the NSA might have collected this specific information and that such information might have assisted him with establishing an alibi. Furthermore, assuming *arguendo* that the NSA had collected this specific information, it would not undermine our confidence in the jury's verdict in light of the evidence placing

Davis's other cell phone in the vicinity of the October robbery and the prior attempted robberies at all relevant times.

### B. *Sentencing Issues*

#### 1. *Davis's sentence*

■ Davis contends that his sentence of 20 years' imprisonment is procedurally unreasonable because the jury was unable to return a unanimous verdict on the substantive Hobbs Act counts and firearms counts and, thus, the guilty verdict on Count 1 leaves unanswered in what specific aspects of the charged conspiracy he was involved. Thus, Davis argues that the district court erred by applying the cross-referencing provisions in U.S.S.G. § 2B3.1(c). He also asserts that his sentence is substantively unreasonable because the district court imposed a sentence that was greater than necessary to reflect the statutory sentencing factors in 18 U.S.C. § 3553.

We conclude from the record that Davis's sentence is reasonable. The district court correctly applied the guidelines, and it articulated in detail the § 3553 factors that it considered in choosing the guideline sentence. Davis fails to show any abuse of discretion in the district court's imposition of the 20–year sentence. Accordingly, we affirm Davis's sentence.

#### 2. *Williams's sentence*

■ Williams asserts that his sentence violates the Sixth Amendment because the district court, not the jury, made the finding that he participated in the October 1 robbery and was culpable for the death of

---

4. Davis's motion did not technically seek reconsideration of any of the issues he raised in his initial timely filed motion for new trial. This motion, in effect, was a second motion for new trial that was arguably untimely under Federal Rule of Criminal Procedure 33(b); however, any untimeliness challenge was forfeited by the government. *See Eberhart v. United States,* 546 U.S. 12, 18–19, 126 S.Ct. 403, 406–07, 163 L.Ed.2d 14 (2005) (finding that because the government failed to raise a defense of untimeliness it forfeited that defense).

the Brink's guard. His argument is foreclosed by binding precedent. *See United States v. Smith,* 741 F.3d 1211, 1226–27 (11th Cir.2013) (holding that sentencing enhancements based on judicial fact-finding, even when based on acquitted conduct, do not violate the Sixth Amendment); *United States v. Faust,* 456 F.3d 1342, 1347–48 (11th Cir.2006) (same). Accordingly, we affirm Williams's sentence of 23 years' imprisonment.

## V. CONCLUSION

We affirm the judgments of conviction for defendants Johnson, Davis, and Williams. We conclude that Davis's and Williams's sentences are procedurally and substantively reasonable, and we affirm these sentences as well.

**AFFIRMED.**

